Original
No. LD-2005-009

## CODDINGTON'S CASE

Argued: January 18, 2007
Opinion Issued: March 8, 2007

*Landya B. McCafferty*, of Concord, on the petition and orally, for the professional conduct committee.

*Paul F. Coddington, Jr.*, on the motion for reconsideration and orally, *pro se.*

DALIANIS, J. On December 8, 2005, the Supreme Court Professional Conduct Committee (PCC) filed a petition recommending that we suspend the respondent, Paul F. Coddington, Jr., from the practice of law in New

Hampshire for two years. Because the respondent did not answer the petition, its allegations were deemed admitted. SUP. CT. R. 37(16)(c). On March 28, 2006, we ordered the respondent to show cause why he should not be disbarred for his violations of the rules of professional conduct. The respondent did not file a response to the show cause order and, on October 31, 2006, he was disbarred.

The respondent moved for reconsideration of the disbarment order on November 13, 2006. After hearing oral argument on the respondent's motion, we granted it and vacated our disbarment order.

The petition alleged the following violations of the New Hampshire Rules of Professional Conduct (Rules), which the respondent does not dispute and which are deemed admitted pursuant to Supreme Court Rule 37(16)(c):

(1) *Rule 1.15(a)(1)*. Rule 1.15(a)(1) requires a lawyer who is holding the property of a client or a third person in connection with representation to keep the property separate from the lawyer's own property and to deposit funds in clearly designated trust accounts maintained in accordance with the Supreme Court Rules. The respondent violated this rule by withdrawing client funds from his trust account for personal use without proper authorization and by commingling earned legal fees with client funds. Moreover, he commingled his own funds with those of his clients by leaving fees in trust for extended periods of time after he had earned them.

(2) *Rule 1.15(a)(2) and Supreme Court Rule 50(2) A and F*. These rules require a lawyer to maintain records regarding the handling and disposition of all client funds and property in the lawyer's possession in accordance with Supreme Court Rules. The respondent failed to keep running balances for each client, rarely recorded the source and purpose of cash receipts, and failed to perform monthly reconciliations as required by the Supreme Court Rules.

(3) *Rule 8.1(b)*. This rule requires a lawyer involved in a disciplinary matter to respond to a lawful demand for information. The respondent violated this rule when he failed to respond to the letter of complaint.

(4) *Rule 8.4(a)*. This rule makes it professional misconduct to violate the Rules.

For this misconduct, the PCC recommended that the respondent be suspended for a period of two years following the date of final court approval of the recommendation and that his reinstatement to practice be conditioned upon meeting certain requirements. The respondent agrees with this recommendation.

■ In attorney discipline matters, we retain "ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Wolterbeek's Case*, 152 N.H. 710, 714 (2005) (quotation omitted). In determining a sanction, we are mindful that the purpose of attorney discipline is not to inflict punishment, but rather "to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Richmond's Case*, 152 N.H. 155, 159-60 (2005). We judge each attorney discipline case on its own facts and circumstances, taking into account the severity of the misconduct and any mitigating circumstances appearing in the record. *Id.* at 160. "The gravity of unprofessional conduct is not determined solely by the number of rules broken or by the particular rules violated, but is determined largely with reference to the attorney's behavior." *Morgan's Case*, 143 N.H. 475, 477 (1999).

■ Although we have not adopted the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS), we look to them for guidance. *Wolterbeek's Case*, 152 N.H. at 714. The STANDARDS list the following factors for consideration in imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. STANDARDS, *supra* § 3.0; *Wolterbeek's Case*, 152 N.H. at 714.

In applying these factors, the first step is to categorize the respondent's misconduct and identify the appropriate sanction. *Wolterbeek's Case*, 152 N.H. at 714. We then consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Richmond's Case*, 152 N.H. at 160-61.

Here, the respondent's misconduct involves: (1) failure to safeguard his client's property; (2) failure to maintain proper records; and (3) failure to cooperate.

We first consider the sanction for the respondent's failure to safeguard his client's property. The STANDARDS provide that suspension is generally fitting when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. STANDARDS, *supra* § 4.12. Disbarment is reserved for when a lawyer "knowingly converts client property," in addition to causing injury or potential injury to the client. STANDARDS, *supra* § 4.11.

There was no evidence that the respondent knowingly converted client property. As the hearing panel observed and as the PCC noted in its recommendation for a two-year suspension, the disciplinary office never argued that there was intentional theft. Craig Calaman, the auditor for the

PCC, testified that he "did not see evidence . . . at all" that the respondent knowingly and willfully stole from his clients. Calaman testified that the respondent "commingled" client funds with his own funds by failing to remove his earned fees from his client trust account at or shortly after the time the fees were earned. As Calaman explained, "The proper procedure is, once a fee is earned, it is removed from the [trust] account, and either put into your firm's operating account [or] your personal account, . . . but . . . at the time it is no longer client funds, it is removed from [the trust] account." The respondent withdrew his earned fees directly from his trust account to pay personal or office expenses instead of first moving them into his operating account and withdrawing them from that account to pay such expenses.

Moreover, although commingling funds in this way was improper, as the PCC observed in its recommendation, the actual loss to any client was negligible. After the audit was completed, Calaman concluded that the respondent owed one client $39.60. The PCC observed in its recommendation for a two-year suspension that the respondent has repaid this amount.

█ As there is no evidence that the respondent knowingly converted client funds, we conclude that suspension is the correct sanction for his failure to safeguard his client's property.

We next consider the sanction for the respondent's failure to maintain proper records and cooperate with the PCC's investigation. This conduct involves the respondent's violation of duties that he owed to the legal system. The STANDARDS provide that suspension is fitting when a lawyer knowingly violates a court order or rule, and there is potential injury to a client or a party, or interference or potential interference with a legal proceeding. STANDARDS, *supra* § 6.22. The commentary to the STANDARDS states that "[s]uch knowing violations can occur when a lawyer fails to comply with a court order that applies directly to him or her." *Id.* Reprimand, on the other hand, is suitable when a lawyer's mental state is "negligent" instead of "knowing." STANDARDS, *supra* § 6.23. The commentary explains that "[c]ourts . . . impose reprimands when lawyers neglect to respond to orders of the disciplinary agency." *Id.*

The PCC observed in its recommendation for a two-year suspension that the respondent's state of mind with respect to record-keeping was gross negligence or recklessness. This observation is supported by Calaman's testimony that the respondent "had no idea how to keep a bank account" for his law office. The hearing panel noted that the respondent reacted to the PCC's investigation out of "fear and ignorance as to what steps to take." He responded like a "deer in the headlights" according to

both the hearing panel and the PCC, which the office of disciplinary counsel recognized was not an uncommon reaction. (Quotation omitted.)

■ In light of the findings with respect to the respondent's mental state, we conclude that suspension is the correct sanction for his failure to maintain the right financial records, as required by our rules, and for his failure to cooperate with the PCC's investigation.

Therefore, we conclude that suspension is the suitable sanction for all three categories of the respondent's misconduct. We observe that this sanction is in accord with our prior decisions.

"In cases involving an attorney's misuse of client funds, we often take severe disciplinary action." *Douglas' Case*, 147 N.H. 538, 544 (2002). This is because "[a] lawyer's obligation to refrain, at the least, from misuse of a client's property must stand among the most insistent of professional norms." *Id.* (quotation omitted). Thus, for instance, in *Eshleman's Case*, 126 N.H. 1, 2 (1985), we disbarred an attorney because, among other things, his trust account was out of trust by more than $70,000. Similarly, in *Woiccak's Case*, 131 N.H. 735, 739-40 (1989), we disbarred an attorney who acted deliberately and knowingly and where one client never recovered the $77,000 he entrusted to the firm in connection with a real estate transaction. We also disbarred the attorney in *Farley's Case*, 147 N.H. 476, 476-77 (2002), because he transferred funds, even after we enjoined him from doing so, failed to produce requisite records, which precluded any audit from occurring, and failed to pay his client $6,000 from a personal injury settlement.

In *Douglas' Case*, 147 N.H. at 545, however, we suspended the attorney for six months for withdrawing her fees from an escrow account without her client's permission, where the attorney honestly, but erroneously, believed that her conduct was legitimate. In *Morgan's Case*, 143 N.H. 475, 476 (1999), we imposed a conditionally delayed suspension of two years upon an attorney who, when he discovered a substantial shortage in his trust account, put in his own money to cover the shortage, investigated the matter, reported himself to the PCC, and made good faith remedial efforts. We ruled that this was the correct sanction because, even though his "admittedly poor accounting methods, numerous bookkeeping errors, inaccurate client trust reporting and commingling of funds" were "patently unacceptable, . . . he accepted responsibility for his actions and made good faith efforts to take corrective measures to prevent actual harm." *Morgan's Case*, 143 N.H. at 477-78.

The respondent's misconduct is similar to that involved in *Morgan's Case*. Morgan, like the respondent, was a solo practitioner. *Id.* at 476. Like the respondent, he had one client trust account in which he held both

earned and unearned client deposits, and, like the respondent, he failed to keep proper records. *Id.* In addition, like the respondent, Morgan paid expenses from his client trust account instead of withdrawing funds, putting them into his operating account, and then paying his expenses. *Id.*

The respondent's conduct is slightly worse than Morgan's conduct, however, because, whereas none of Morgan's clients were harmed by his misconduct, *id.* at 477, one of the respondent's clients lost approximately $40, and because, whereas Morgan self-reported to the PCC when he discovered the shortage, *id.* at 476, the respondent did not self-report and initially failed to respond to the PCC's requests for information.

On the other hand, the respondent's conduct is not nearly as egregious as that of the attorneys whom we have disbarred for trust account irregularities. While the attorney in *Eshleman's Case*, 126 N.H. at 2-3, lied at his disciplinary hearing and failed to notify the PCC or this court that he had been arrested for grand theft, the respondent here testified candidly, according to the hearing panel. While the attorney in *Woiccak's Case*, 131 N.H. at 737-38, was willfully blind to the irregularities in his firm's trust account, failing to investigate even after learning that the account was missing $70,000 only four days after this amount was deposited, the hearing panel here found that the respondent's lack of knowledge was genuine.

Also, the amounts at issue in the cases in which we have disbarred attorneys for trust account irregularities are much larger than those at issue here. In *Farley's Case*, 147 N.H. at 477, one client was owed $6,000 and, by the time the account was frozen, it was out of trust by more than $3,000. In *Eshleman's Case*, 126 N.H. at 2, the attorney's trust account was out of trust by more than $70,000. In *Woiccak's Case*, 131 N.H. at 739-40, one client was owed $77,000. Here, the respondent owed one client $39.60, which he has since repaid.

Having concluded that suspension is the suitable sanction for the respondent's misconduct, we next consider the effect of mitigating or aggravating factors with respect to this sanction.

As mitigating factors, the PCC considered that the respondent has no prior disciplinary record, the actual amount of money involved was relatively small and he repaid the funds a client actually lost. *See* STANDARDS, *supra* § 9.32(a), (d). The hearing panel found that the respondent "fully understood the issues and was facing them maturely." *See* STANDARDS, *supra* § 9.32(l).

The record reveals additional mitigating factors as well. As discussed previously, there was no evidence that the respondent had a dishonest motive. *See* STANDARDS, *supra* § 9.32(b). Moreover, at the time of these transgressions, he was a new attorney. *See* STANDARDS, *supra* § 9.32(f).

Further, he testified at the hearing before the hearing panel, and alluded to this again in oral argument to this court, that, since the misconduct, he has been diagnosed with depression for which he has received treatment. *See* STANDARDS, *supra* § 9.32(c).

For aggravating factors, the PCC considered the respondent's failure to respond and communicate with the attorney discipline office and, initially, to supply the records required for the audit. *See* STANDARDS, *supra* § 9.22(e).

Considering the above facts, the findings by both the hearing panel and the PCC, the arguments made by the parties, the mitigating and aggravating factors, and the two and one-half year suspension to which the respondent has been subject while this proceeding was pending, we adopt the PCC's recommendation and order the respondent suspended for two years based upon his violations of Rules 1.15(a)(1), 1.15(a)(2), 8.1(b) and 8.4(a), as well as Supreme Court Rule 50. The period of suspension shall run from the date upon which this order becomes final. The respondent's reinstatement to the practice of law in New Hampshire is conditioned upon the following: (1) he must demonstrate to the staff auditor of the attorney discipline office that he has an accounting system in place that complies with Supreme Court Rule 50; (2) in each of the first three years of resuming practice, his practice will be subject to random audit by the staff auditor and the costs of such audit(s) shall be paid by the respondent; (3) within a reasonable time before resuming practice, the respondent shall attend a full session of the practical skills course offered twice each year by the New Hampshire Bar Association; and (4) he shall comply with all requirements for reinstatement set forth in Supreme Court Rule 37(14).

This sanction satisfies the goals of the attorney discipline system by protecting the public and preserving the integrity of the legal profession. We further order the respondent to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. SUP. CT. R. 37(19).

*So ordered.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.